**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SANDRA WARD, | ) | CASE NO. 1:17-cv-00667 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| *Acting Comm'r of Soc. Sec.*, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Sandra Ward (hereinafter "Plaintiff"), challenges the final decision of

Defendant Nancy A. Berryhill, Acting Commissioner of Social Security (hereinafter

"Commissioner"), denying her applications for a Period of Disability ("POD") and Disability

Insurance Benefits ("DIB") under Titles II of the Social Security Act, 42 U.S.C. §§ 416(i), 423 *et*

*seq.* ("Act"). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the

undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule

72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

## I.  Procedural History

On January 30, 2014, Plaintiff filed her applications for POD and DIB, alleging a disability

onset date of September 2, 2010. (Transcript ("Tr.") 183-186). The application was denied

initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative

Law Judge ("ALJ"). (Tr. 136-139, 142-152). Plaintiff participated in the hearing on February 9,

2016, was represented by counsel, and testified. (Tr. 38-94). A vocational expert ("VE") also

participated and testified. *Id*. On March 15, 2016, the ALJ found Plaintiff not disabled. (Tr. 32).

On February 28, 2017, the Appeals Council declined to review the ALJ's decision, and the ALJ's

decision became the Commissioner's final decision. (Tr. 1-3). On March 30, 2017, Plaintiff filed

a complaint challenging the Commissioner's final decision. (R. 1). The parties have completed

briefing in this case. (R. 14-1 & 16).

Plaintiff asserts the following assignments of error: (1) the ALJ erred by finding no severe

impairment of the bilateral knees, and (2) the ALJ erred by finding Plaintiff did not meet Listing

1.02(A). (R. 14-1).

## II. Evidence[1]

### A. Personal and Vocational Evidence

Plaintiff was born in November of 1967 and was 42-years-old on her alleged onset date.

(Tr. 183). She had a high school education. (Tr. 212). She had past relevant work as an

assembler, daycare worker, and cleaner/housekeeper. (Tr. 31, 84).

---

[1] The recitation of the evidence is not intended to be exhaustive. Because both of Plaintiff's assignments of error revolve entirely around her alleged bilateral knee impairment, the court limits the discussion of other medical conditions. Furthermore, as the ALJ found Plaintiff's allegations regarding her symptoms to be "not entirely credible" (Tr. 27-28) and Plaintiff has not challenged the ALJ's credibility determination or taken issue with the VE's testimony, the court foregoes any summary of the hearing testimony as well.

**B. Relevant Medical Evidence**

**1. Treatment Records *Before* Date Last Insured**

In disability paperwork, Plaintiff identified her physical and mental conditions that limited her ability to work as (1) herniated disc L4 & 5, (2) right hand problems, (3) sciatic left leg, and (4) major depressive disorder. (Tr. 211).

On September 8, 2010, Plaintiff was seen by Shu Huang, M.D., after spraining her right wrist due to a fall at work. (Tr. 308-309). On physical examination, Plaintiff's "[m]uscle stretch reflexes are 2+ and symmetric at bilateral patellae, [A]chilles. Muscle strength is 5/5 bilaterally in hip flexion, knee extension, ankle DF/PF, EHL. Able to stand on heels and toes." (Tr. 308). Dr. Huang noted that Plaintiff had symptoms "that are much more than one expect from a simple fall. I spent long time asking her to work on regular activity and not to limit her daily activity." (Tr. 309).

On October 13, 2010, chiropractor Matthew Rivers noted "DTR of the lower extremity revealed a 2 out of 4 rating bilaterally for the Patella and a 1 out of 4 rating bilaterally for the Achilles," motor strength of the right knee for flexion and extension was 5/5, and left knee motor strength was 4/5. (Tr. 289). Plaintiff was also noted to have difficulty with heel and toe walking. *Id*. Supine straight leg raise was negative on the right and positive at 15 degrees on the left. *Id*.

On December 18, 2010, Plaintiff underwent an occupational medicine consultation to evaluate Plaintiff's workers compensation claims related to her fall. (Tr. 723-727). On exam, Plaintiff had normal motor strength and reflexes in her lower extremities, and a negative straight leg raise test. (Tr. 725). The examiner noted multiple Waddell's signs, which demonstrate

"abnormal illness behavior."[2]  (Tr. 725).

On March 23, 2011, chiropractor Rivers indicated in a letter that Plaintiff was experiencing swelling in her right wrist. (Tr. 622-624). Plaintiff's "[m]otor strength testing of the lower extremity was rated a 4 out of 5 on the left for knee flexion and extension and a 5 out of 5 on the right for knee flexion and extension. The patient was unable to perform heel walking and toe walking at this time because she is wearing a walking boot due to an injury she sustained to her right foot." (Tr. 623).

On September 15, 2011, chiropractor Rivers observed Plaintiff walking with a limp. (Tr. 529).

On February 28, 2012, Mark Allen, M.D., noted "[a]ggravation with straight leg raising. Reflexes are symmetrical within normal limits, however, there may be some sensory changes in the left leg more th[a]n the right …" (Tr. 445-446).

On March 18, 2012, chiropractor Anthony J. Simone observed that Plaintiff had a positive straight leg raise test at 42 degrees on the right and 44 degrees on the left. (Tr. 442).

On March 21, 2013, Sherif Salama, M.D., examined Plaintiff. (Tr. 1233-1237). With respect to Plaintiff's knees, Dr. Salama noted range of motion was within normal limits for flexion and extension, muscle strength and tone were within normal limits, and no spasticity or

---

[2] "A positive Waddell's sign indicates that there exists a non-organic (*i.e.*, psychological or psychosocial) component to an individual's lower back pain." *Huckleberry v. Comm'r of Soc. Sec.*, 2012 WL 3886431 at note 1 (E.D. Mich. Aug. 6, 2012) (citations omitted); *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 420 (6th Cir. 2008) (Waddell's signs are a clinical test for patients with low back pain that can be used to indicate whether the patient is exaggerating symptoms); *Mabra v. Comm'r of Soc. Sec.*, 2012 WL 3600127 at note 3 (S.D. Ohio Aug. 21, 2012) ("'Waddell's signs' refers to a system of identifying psychogenic or nonorganic manifestations of pain.") (citations omitted).

atrophy were observed. (Tr. 1235-1236).

On May 24, 2013, Plaintiff was seen by occupational therapist Kathy Stroh regarding complaints of right hand pain and constant shaking in the right hand. (Tr. 826-827). The therapist stated that Plaintiff's hand was not shaking until she related that specific symptom to her, and that her hand did not shake when writing or performing the 9-hole peg test. (Tr. 827).

On June 3, 2013, Dr. Salama noted that Plaintiff was walking with an assistive device. (Tr. 1209).

On June 4, 2013, Mark R. Grubb, M.D., noted Plaintiff was using a cane and had an antalgic gait. (Tr. 743).

On July 2, 2013, Dr. Grubb noted Plaintiff walked with a "slightly antalgic" gait. (Tr. 742).

On July 16, 2013, Dr. Grubb saw Plaintiff who related a great deal of back and leg pain. (Tr. 741). She was noted to have a normal gait. *Id.*

On August 22, 2013, Dr. Grubb noted that Plaintiff was "doing much better," that physical therapy was helping," and that her "gait is improved." (Tr. 740). Dr. Grubb recommended a further increase in her activity levels. *Id.*

On October 17, 2013, Dr. Grubb noted that Plaintiff had a slightly antalgic gait, but was not using a cane. (Tr. 739). Her straight leg raise test was negative. *Id.*

On November 12, 2013, Plaintiff was seen by Michael Gomez, M.D., as a new patient with complaints of right knee pain that had been chronic for the past year. (Tr. 803). She wanted to establish physical therapy, reported no falls thus far, and denied significant numbness or weakness. *Id.* Her pain was controlled with Neurontin. *Id.* On examination, her right knee had "no varus/valgus laxity, neg Ant drawers, 5/5 strength flex/ext. No sensory deficits." (Tr. 806). In addition, neurologically she was "[i]ntact and symmetric," had a normal gait, normal reflexes,

grossly intact sensation, and no motor deficits. (Tr. 806).

On November 21, 2013, Plaintiff complained of pain radiating down her right leg all the way top her foot. (Tr. 738). Dr. Grubb noted that Plaintiff stood with good posture, had a slightly antalgic gait, and was able to heel and toe walk. *Id.* Straight leg raise test was negative bilaterally. *Id.*

On December 2, 2013, an MRI of Plaintiff's lumbar spine yielded a normal result. (Tr. 737, 746).

On December 19, 2013, Plaintiff reported worsening leg pain to Dr. Grubb. (Tr. 737). On physical examination, he noted that Plaintiff "stands up readily from her chair," "has normal gait," and "is able to heel and toe walk." *Id.* He recommended pain management. *Id.*

On January 13, 2014, nurse practitioner Elise Leone noted that Plaintiff was using a cane, that her range of motion in her right knee was pain free but her left knee had "active painful range of motion." She had limited knee strength bilaterally. (Tr. 765-766).

On January 30, 2014, Plaintiff stated she fell in her driveway injuring her right knee two weeks earlier. (Tr. 783-784). On examination, Plaintiff's right knee was tender and unable to bear weight, while her left knee was normal. (Tr. 784). She was diagnosed with a knee contusion. *Id.*

Also on January 30, 2014, imaging of Plaintiff's right knee revealed "no evidence for acute traumatic injury," "no acute fracture or dislocation," the knee joint space was maintained, and there was no joint effusion. (Tr. 787-788). Some mild periosteal reaction along the fibula was noted. *Id.*

On February 6, 2014, Plaintiff's gait was noted to be "without instability." (Tr. 779).

On March 21, 2014, treatment notes indicate that according to the Ohio Automated

6

Prescription Reporting System ("OARRS"), Plaintiff had "multiple prescriptions from multiple providers" and "should not be prescribed or administered narcotics in the [emergency department] unless mandated to treat an emergency medical condition." (Tr. 879-880).

On March 31, 2014, Plaintiff was evaluated after being in a motor vehicle accident and was found to be ambulatory at the scene. (Tr. 895). She had normal range of motion in all four extremities. (Tr. 896). X-rays and CT scans of Plaintiff's spine were normal. (Tr. 904-905).

On May 14, 2014, Henry Vucetic, M.D., noted Plaintiff had normal and pain free range of motion in her right knee, but pain in her left knee on active range of motion. (Tr. 958). Her patella reflexes were 2/4 on the right and 1/4 on the left. *Id.* He noted she had a cane. (Tr. 957).

On September 22, 2014, Louis Keppler, M.D., wrote that "MRI of her hip and spine do not demonstrate any significant pathology relative to her lower extremity complaints. I do not believe there is anything from an operative perspective that can be done. Because of her relative inactivity and abnormalities of gait she has developed a secondary problem with her feet" that he felt could be treated with shoe in-lays. (Tr. 1365). He also opined that it may be reasonable to refer Plaintiff to a multi-disciplinary pain management program. *Id.*

On October 24, 2014, Plaintiff was seen by Jared Placeway, D.O., for complaints of pain on the left side of her body from shoulder to her foot. (Tr. 1532). On physical examination, Plaintiff had an antalgic gait with a narrow base of support, but no steppage. (Tr. 1536). She had 5/5 motor strength in all extremities except for the left hip, which was 4/5. *Id.*

On November 5, 2014, Dr. Placeway noted 5/5 strength in all extremities. (Tr. 1524). Her gait remained unchanged. *Id.*

**2. Treatment Records *After* December 31, 2014—the Date Last Insured**[3]

On January 29, 2015, clinical psychologist James Meddling, Ph.D., wrote a letter summarizing Plaintiff's treatment from September 4, 2014 to the present. (Tr. 1371). Dr. Meddling noted Plaintiff had reported significant complaints of low back, right hand, and wrist pain, which aggravated her major depression. *Id.* Notably, no mention is made of knee pain or pain in her lower extremities. *Id.*

On April 20, 2015, Plaintiff went to the Emergency Room due to intermittent pain and swelling in the right leg, which began on March 28, 2015 after she was dancing at a party. (Tr. 1572). She noted most of her pain was located in the right knee. *Id.* On physical examination, "[t]here is chronic pain of the left leg per pt, no deformities. Right leg is slightly more swollen then the left, with no erythema, or increased warmth. There is a small effusion to the right knee, with no laxity. ROM limited secondary to swelling. No erythema, or increased warmth. No isolated bony pain. Normal pulses." (Tr. 1574). She had a steady gate with a cane and normal sensation. *Id.* She was diagnosed with a right knee Bakers' cyst. (Tr. 1575).

On April 30, 2015, she was seen by Dr. Placeway, who noted "[h]er primary complaint today is new onset right knee pain, with potential medial meniscal tear." (Tr. 1481). That same date, an x-ray of Plaintiff's right knee, which was compared to one from January 30, 2014, revealed "no identifiable fracture, dislocation, arthritic change or lytic or blastic lesion on the two views obtained." (Tr. 1588). The impression was no significant soft tissue or bony

---

[3] The court recognizes that evidence that does not establish a claimant was disabled prior to the expiration of her disability insured status is immaterial. *See, e.g., Perschka v. Comm'r of Soc. Sec.*, 411 Fed. App'x 781, 787 (6th Cir. 2010) (*citing Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990)). Without finding that the evidence post-dating Plaintiff's date last insured ("DLI") is material, the court includes it in its summary, as Plaintiff has argued the evidence relates back to the period before her DLI.

abnormality. *Id.*

On May 14, 2015, an MRI of the right knee, which was compared to the aforementioned x-ray, revealed "prominent joint effusion and … an especially large communicating popliteal cyst. A thickened medial patellar plica is also seen. Rather marked patellofemoral degenerative change is seen with chondromalacia and with subchondral cystic change in the patella. (Tr. 1585).

On June 12, 2015, Plaintiff was seen in the ER for complaints of increasing right leg pain over the last few weeks. (Tr. 1558). Plaintiff stated the pain initially started in March of 2015.[4] *Id.*

On November 10, 2015, Plaintiff received a Toradol injection. (Tr. 1652). On November 13, 2015, Plaintiff received the first of three Hyalgan injections. (Tr. 1646). On November 20, 2015, she received the second of three Hyalgan injections. (Tr. 1636). On November 30, 2015, she received a third Hyalgan injection. (Tr. 1634).

On December 4, 2015, another MRI of Plaintiff's left knee yielded the following impression: "[m]arked patellofemoral degenerative change with chondromalacia. Lesser involvement of the medial femorotibial compartment. Large joint effusion and popliteal cyst. No meniscal tear, recent fracture or ligamentous disruption." (Tr. 1701).

On December 7, 2015, Plaintiff received a left knee injection. (Tr. 1628).

**3. Medical Opinions Concerning Plaintiff's Functional Limitations**

On March 15, 2014, after reviewing the evidence of record, state agency reviewing

---

[4] *See also* Tr. 1483, in which the record on March 12, 2015, indicates Plaintiff's history of present illness as "[k]nee pain since 2 days, no swelling, thinks probably way she got up on her knee caused it, no injury/popping."

physician Anne Prosperi, D.O., opined that Plaintiff could lift, carry, push and pull up to 20 pounds occasionally and 10 pounds frequently, stand and/or walk 4 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. (Tr. 103-105). Dr. Prosperi concluded that Plaintiff was limited to only frequently pushing/pulling with her right upper extremity and that usage of her cane was "not supported by the objective findings." (Tr. 104).With respect to postural limitations, Dr. Prosperi limited Plaintiff to never climbing ladders, ropes, or scaffolds; occasionally stooping, kneeling, crouching, crawling, and climbing ramps and stairs; and frequently balancing. *Id.* Dr. Prosperi opined that Plaintiff could handle (gross manipulation) with her right hand on a frequent basis, but must avoid all exposure to unprotected heights, heavy machinery, and commercial driving. (Tr. 104-105).

On July 17, 2014, after reviewing the evidence of record, state agency reviewing physician Diane Manos, M.D., opined that Plaintiff could lift and carry up to 10 pounds occasionally and frequently, stand and/or walk 4 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. (Tr. 126).

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner determines whether a claimant is disabled by way of a five-stage

process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6ᵗʰ Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a medically determinable "severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent her from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

### IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2014.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of September 2, 2010 through her date last insured of December 31, 2014 (20 CFR 404.1571 *et seq*.).

3. Through the date last insured, the claimant had the following severe impairments: degenerative disc disease with neuropathy, degenerative

joint disease of right hand with mild ulnar variance, obesity, and affective disorder (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she could stand/walk 4 hours out of an 8 and sit 6 hours out of an 8. She was able to use the right upper extremity occasionally for handling and frequently for fingering. She could occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds. She could frequently balance, but occasionally stoop, kneel, crouch or crawl. She needed to avoid concentrated exposure to extreme cold, humidity, fumes, odors, dusts, gasses and poor ventilation. She needed to avoid all exposure to hazards defined as industrial machinery, unprotected heights, and similar things. She could perform moderately complex tasks without demands of fast pace or high production rates (defined as up to SVP 4 type jobs). She was able to adapt to routine changes that were explained in advance.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on November **, 1967 and was 47 years old, which is defined as a younger individual age 45-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date[] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security

Act, at any time from September 2, 2010, the alleged onset date, through December 31, 2014, the date last insured (20 CFR 404.1520(g)).

(Tr. 18-32).

## V. Law and Analysis

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id.*) However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B. Plaintiff's Assignments of Error**

**1. Plaintiff's Knee Impairments and Listing 1.02(A)[5]**

In the first assignment of error, Plaintiff asserts the ALJ erred when she failed to include a bilateral knee impairment among Plaintiff's severe impairments. (R. 14-1, PageID# 1795-1798). In her second assignment of error, Plaintiff contends that the ALJ erred by finding her knee impairments did not meet the requirements of Listing 1.02(A). (R. 14-1, PageID# 1798-1801). Conversely, the Commissioner argues that the ALJ's decision was supported by substantial evidence at Step Two, because the ALJ properly found that Plaintiff's knee impairments did not have more than a minimal effect on her functioning prior to the DLI. (R. 16, PageID# 1816-1820). With respect to the second assignment of error, the Commissioner asserts the ALJ properly found Plaintiff did not meet Listing 1.02(A), because the evidence of record at the time her insured status expired only demonstrated a knee bruise that had resolved. (R. 16, PageID# 1820-1827).

As defined by Social Security regulations, a "severe" impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). "At step two 'significant' is liberally construed in favor of the claimant[, but] [t]he regulations provide that if the claimant's degree of limitation is none or mild, the Commissioner will generally conclude the impairment is not severe." *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 428 (6th Cir. 2007). The Sixth

---

[5] Plaintiff's brief sets forth two assignments of error: (1) the ALJ erred by finding no severe impairment of the bilateral knees, and (2) the ALJ erred by finding Plaintiff did not meet Listing 1.02(A) due to the same bilateral knee impairment. (R. 14-1). In this court's view, the viability of both of these claims rise or fall based on the reasonableness of the ALJ's determination that Plaintiff did not meet her burden of demonstrating the presence of a severe knee impairment prior to the DLI.

Circuit Court of Appeals has construed Step Two's severity requirement as a "de minimus hurdle." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n. 2 (6th Cir. 2007). However, as an ALJ must move on to the subsequent steps in the sequential evaluation even if only one impairment is found to be "severe," an ALJ is not required to analyze the remainder of a claimant's impairments to determine whether they too are severe. *See, e.g., Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6th Cir. 2008) ("The fact that some of [claimant's] impairments were not deemed to be severe at step two is … legally irrelevant") (*citing Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987) (same) holding that the failure to find that an impairment was severe was harmless error where other impairments were deemed severe); *Nejat v. Comm'r of Soc. Sec.*, 359 Fed. App'x. 574, 577 (6th Cir.2009) (same); *McGlothin v. Comm'r of Soc. Sec.*, 299 Fed. App'x. 516, 522 (6th Cir. 2008)). After the ALJ makes a finding of severity as to even one impairment, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96–8p, 1996 WL 374184 at *5 (Jul. 2, 1996).

It is undisputed that the ALJ did not find Plaintiff's knee impairments to be severe, and it also did not meet Listing 1.02(A). (Tr.19). Specifically, the ALJ found as follows:

> Listing 1.02 is not met. While the representative argued the claimant met, listing l.02(A) the record reflects imaging of the right knee in 2014 demonstrated only mild periosteal reaction (Ex. 7F/14). Furthermore, objective findings prior to the date last insured reveal 4/5 muscle strength in the left knee and 5/5 muscle strength in the right knee (Ex. 7F). The record does not demonstrate crepitus or other objective findings regarding the knees prior to the date last insured. Therefore listing l.02(A) is not met.
>
> ***
>
> The claimant established care with Michael Gomez, MD, in November 2013 and acknowledged that Neurontin controlled her knee and back pain (Ex. 7F/30). Physical examination of the right knee revealed 5/5 strength, no sensory deficits

and no laxity (Ex. 7F/33). She appeared in no distress and an abnormal gait was not observed (Ex. 7F/33).

\*\*\*

Ciara Simon, RN, also examined the claimant on January 30, 2014 due to left leg/thigh pain after sustaining a fall in her driveway two weeks prior (Ex. 7F/10-11). The claimant alleged she had been unable to engage in full weight bearing since the injury (Ex. 7F/11). Examination was normal other than bruising and tenderness to the right knee (Ex. 7F/11). Imaging revealed only a mild periosteal reaction along the fibula (Ex. 7F /11 ). She was diagnosed with a knee contusion and advised to wrap her right knee (Ex. 7F/l 1-14).

\*\*\*

By November 5, 2014, Dr. Placeway observed 5/5 strength in all extremities, with the rest of her symptoms unchanged (Ex. 24F/58).

\*\*\*

At times, the record demonstrates the claimant had an antalgic gait and used a cane; however, these observations were not consistent. Furthermore, pursuant to SSR 96-9p the record does not support medical documentation establishing the need for an assistive device. The record demonstrates the claimant reported with physical therapy her symptoms improved; however, examiners felt her use of physical therapy was not consistent and therefore hindered her recovery. Moreover, the claimant testified Dr. Placeway prescribed her a cane; however, the record demonstrates Dr. Placeway did not recommend a cane until after her date last insured and recommended one due to her knee.[6]

\*\*\*

Moreover while the claimant has alleged limitations related to her knees these limitations are after the date last insured. Instead, she was diagnosed with a knee contusion, which was found to be non-severe.

(Tr. 19, 24-28)

The ALJ's statement that Plaintiff was not diagnosed with any knees ailments, other than a

bruise, until after the DLI is accurate. However, Plaintiff contends that evidence from 2015 post-

---

6 In other portions of the decision, the ALJ cited medical records where no gait abnormality was noted. (Tr. 22-25, *citing* Exhs. 3F at 91; 5F at 4, 12, 18; 7F at 6, 33; 12F at 232).

16

dating the December 31, 2014 DLI establishes that her knee impairments were present before her insured status expired. The Sixth Circuit observed that "[e]vidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 Fed. App'x 841, 845-46 (6th Cir. 2004) (c*iting Cornette v. Sec'y of Health & Human Servs.*, 869 F.2d 260, 264 n. 6 (6th Cir. 1988)).

Plaintiff relies on *Ellis v. Schweiker* where the Sixth Circuit held that there was "ample evidence" to support the claimant's assertion of a long-standing mental impairment that was disabling prior to the DLI, while there was only one piece of evidence that even arguably directly contradicted the claim. 739 F.2d 245 (6th. Cir. 1984). The *Ellis* decision considered a substantial amount of evidence related to the claimant's mental impairment that pre-dated the DLI, as well as other mental impairment evidence that post-dated the DLI. *Id*. The court observed that the post-DLI evidence was probative of his condition prior to the DLI. 739 F.2d at 247. While the *Ellis* decision suggests an ALJ is not prohibited from considering post-DLI evidence, it does not establish any substantive or procedural rule that the ALJ failed to follow. Moreover, the facts underlying the *Ellis* decision are not analogous to the case at bar. Therein, the Sixth Circuit found the ALJ "improperly focused on … one piece of evidence and ignored the 'voluminous evidence' in support of the plaintiff's claim." *Barrett v. Sec'y of Health & Human Servs.*, 840 F.2d 1259, 1266 (6th Cir. 1987) (explaining the *Ellis* holding). Here, by contrast, the evidence of knee impairments prior to the DLI was scant. In fact, Plaintiff has pointed to no diagnosis of any knee impairment prior to the DLI other than the right knee contusion. Plaintiff attempts to use the post DLI evidence to establish that her knee conditions were chronic and long-standing as in *Ellis*. However, in *Ellis* there were many records of the claimant's long-standing mental impairments prior to the DLI, including diagnoses of chronic schizophrenia and a seven-month

17

confinement to a psychiatric hospital, rendering the decision to ascribe probative value to subsequent mental health treatment records more reasonable.

Plaintiff also cites *Higgs v. Bowen*, 880 F.2d 860 (6th Cir. 1988) without explanation. (R.14-1, PageID# 1796). The *Higgs* decision is analogous to the case at bar, but supports the ALJ's decision. In *Higgs*, the claimant, whose DLI was in 1979, alleged disability based on heart problems and hypertension in an application filed four years later. 880 F.2d at 862. The court found the claim "totally groundless" where there was "nothing in the objective medical record credibly suggesting that [the claimant] was significantly affected by any of her impairments" prior to 1979 where the "only document directly addressing the duration of her hypertension" was a physical from 1983 stating that hypertension had existed for the past year. *Id.* at 863. The *Higgs* court also noted that testing in 1981 and 1983 that uncovered heart irregularities were "minimally probative of [claimant's] condition in 1979. *Id.*

Plaintiff also relies on a district court decision from Kentucky, wherein the plaintiff argued that she suffered from a slowly progressing impairment (depression and back pain), and "asserted that the ALJ may not refuse to infer the existence of severe limitations prior to the date last insured where there is evidence of these impairments after the date last insured." *Abney v. Astrue*, No. 507-394, 2008 WL 2074011, at *6-7 (E.D. Ky. May 13, 2008). The *Abney* decision addressed this line of argument as follows:

> The Court does not agree with Plaintiff. "Evidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 Fed. Appx. 841, 846 (6th Cir. 2004). Record medical evidence from after a claimant's date last insured is only relevant to a disability determination where the evidence relates back to the claimant's limitations prior to the date last insured. *See Higgs v.. Bowen*, 880 F.2d 860, 863 (6th Cir.1988) (medical evidence after date last insured was only minimally probative of claimant's condition before date last insured, so did not affect disability determination); *see also Begley v. Matthews*, 544 F.2d 1345, 1354 (6th Cir. 1976)

("Medical evidence of a subsequent condition of health, *reasonably proximate to a preceding time* may be used to establish the existence of the same condition at the preceding time.") (emphasis added). It is also apparent that post-date last insured evidence, to the extent that it relates back, is relevant only if it is reflective of a claimant's limitations prior to the date last insured, rather than merely his impairments or condition prior to this date. *See* 20 C.F.R. § 416.945(a)(1) ("Your *impairment(s)*, and any related symptoms, such as pain, *may cause physical and mental limitations that affect what you can do* in a work setting. Your residual functional capacity is the most you can still do despite your *limitations*.") (emphasis added); *see also Higgs*, 880 F.2d at 863 ("The mere diagnosis ..., of course, says nothing about the severity of the condition.").

In this case, although Plaintiff has submitted numerous medical records dating after December 31, 2004, his date last insured, it appears that none of them tend to relate back to the state of Plaintiff's physical or mental limitations prior to this date. . . . none of [the medical] sources attempted to relate their physical and mental assessments back to before Plaintiff's date last insured.

*Abney*, 2008 WL 2074011 at *6-7.

Plaintiff contends that the 2015 evidence relates back to her December 31, 2014 DLI "because there [was] no trauma or an intervening event occurring within the six month period between DLI and the key MRI findings of May [1]4, 2015." (R. 14-1, PageID# 1796, *citing* Tr. 1585-1586). Plaintiff's statement, however, is not supported by the cited records and is merely argument. In fact, the cited record, dated May 14, 2015, states Plaintiff had "1 month medial knee pain." (Tr. 1585). It states nothing that suggests the condition related back to the DLI. In fact, as stated earlier in the court's discussion of the medical evidence above, Plaintiff, during two separate medical encounters, expressly stated that her right knee pain started on March 28, 2015, after she was dancing at a party—more than three months *after* the DLI. Thus, Plaintiff's unsupported argument—that the 2015 records must relate back to her insured time period due to their temporal proximity to the DLI—is a conclusion that does not stem from any identified medical source in the record, and, therefore, is not well taken.

Thus, the dispositive issue is whether the ALJ's determination—that Plaintiff's bilateral

knee impairment was not present on or before December 31, 2014, in the same severity as reflected in 2015 treatment records—was supported by substantial evidence. As noted above, an ALJ's decision is not necessarily deficient simply because there is evidence in the record capable of supporting the opposite conclusion. *Ealy*, 594 F.3d at 512. To the extent Plaintiff's brief takes issue with the ALJ ascribing greater significance to some portions of the record rather than to others, which she portrays as cherry-picking, this alone does not provide a basis for a remand. (R. 14-1, PageID# 1797-1800). Plaintiff does not identify any factual inaccuracy in the ALJ's discussion of the evidence. The Sixth Circuit has found that a claimant's allegation of cherry-picking evidence by the ALJ was unavailing on appeal, agreeing with the court below that such an "allegation is seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. Apr. 3, 2014) (*citing White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) (finding "little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.")); *accord Hammett v. Comm'r of Soc. Sec.*, No. 16-12304, 2017 WL 4003438 at *3 (E.D. Mich. Sept. 12, 2017); *Cromer v. Berryhill*, No. CV 16-180-DLB, 2017 WL 1706418 at *8 (E.D. Ky. May 2, 2017); *Anderson v. Berryhill*, No. 1:16CV01086, 2017 WL 1326437 at *13 (N.D. Ohio Mar. 2, 2017), *report and recommendation adopted*, 2017 WL 1304485 (N.D. Ohio Apr. 3, 2017).

Thus, Plaintiff's argument, that the ALJ should have found the 2015 records related back to the time frame before Plaintiff's DLI, is tantamount to an invitation for this court to reweigh the evidence and to specifically find that the ALJ should have come to a different conclusion. This court's role in considering a social security appeal, however, does not include reviewing the evidence *de novo*, making credibility determinations, or reweighing the evidence. *Brainard*, 889

F.2d at 681; *see also Stief v. Comm'r of Soc. Sec.*, No. 16-11923, 2017 WL 4973225, at *11 (E.D. Mich. May 23, 2017) ("Arguments which in actuality require 're-weigh[ing] record evidence' beseech district courts to perform a forbidden ritual."), *report and recommendation adopted*, 2017 WL 3976617 (E.D. Mich. Sept. 11, 2017)

The court declines to find that the 2015 medical records, because of their relative proximity to the DLI, reflect conditions that were necessarily present during Plaintiff's insured status. Such a finding would entail a prohibited reweighing of the evidence. Furthermore, district courts reviewing social security decisions lack the expertise to make medical judgments. *See, e.g., Robinson v. Colvin*, No. 1:13-CV-02420, 2014 WL 4925034 at *6 (N.D. Ohio Sept. 30, 2014) ("This Court, like the ALJ, has no medical expertise.") Plaintiff's argument is premised on the assumption that Plaintiff's knee impairments, as they existed in May of 2015, must have also been present as of the DLI just five months earlier. This court simply cannot arrive at such a conclusion on its own, and Plaintiff does not cite any medical sources that suggest such an inference is warranted.

The court recommends finding both of Plaintiff's assignments of error to be without merit. The ALJ's determination that the 2015 records do not relate back to the DLI, because evidence of any significant knee problem prior to the DLI is absent, is supported by substantial evidence.[7] Because Plaintiff's argument that she met Listing 1.02(A) is predicated on a finding that the 2015 records relate back to her condition as of her DLI, her second assignment of error also must

---

[7]  There is indeed some evidence of record that Plaintiff suffered from pain in her lower extremities throughout the record, often stemming from pain in her back that radiated down to her legs. However, Plaintiff's argument is not that the ALJ failed to credit complaints of pain in her lower extremities, but rather specifically that her bilateral knee impairments were severe before the DLI and that they met Listing 1.02(A).

fail.

## IV. Conclusion

For the foregoing reasons, it is recommended that the Commissioner's final decision be

AFFIRMED.

s/ *David A. Ruiz*

David A. Ruiz
United States Magistrate Judge

Date: May 1, 2018

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the district court's order.** *See United States v. Walters,* **638 F.2d 947 (6th Cir. 1981);** *Thomas v. Arn,* **474 U.S. 140 (1985),** *reh'g denied,* **474 U.S. 1111 (1986).**